**Richard DARK, Respondent,**

v.

**MRO MID–ATLANTIC CORPORATION, & Marriott Corporation, Appellants.**

**No. 63193.**

Missouri Court of Appeals,
Eastern District,
Division Four.

April 5, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 4, 1994.

Application to Transfer Denied
June 21, 1994.

Louis F. Bonacorsi, Kenneth J. Mallin, St. Louis, for appellants.

Joe D. Jacobson, St. Louis, for respondent.

CARL R. GAERTNER, Judge.

MRO Mid–Atlantic Corporation (MRO) and its former parent, Marriott Corporation (Marriott), appeal from a judgment in favor of Richard Dark, the plaintiff. The subject of this suit is a listing contract between Marriott and Dark to lease or sell real estate located at 15 Florissant Oaks Center in Florissant, Missouri.

█ We need not delve into the intricacies of the corporate structure of the various entities involved in the transaction underlying this litigation in order to reach the dispositive issue. It is sufficient to state that Marriott, on behalf of MRO, entered into a listing contract with Dark, a licensed real estate broker, regarding the sale or lease of the Florissant Oaks property. The contract provided in pertinent part:

> If during the term of said agency, the said property shall be leased with any person or company procured either by you or by ourselves ..., we will pay you a commission as follows:
>
> 1. Lease—4% of the total leasing price, to be paid in full during the first full lease year in three equal payments.
>
> 2. Sale—6% of the sale price payable in full at closing.

During the term of this listing contract, Dark presented Hardee's Food Systems, Incorporated, to MRO and Marriott as a prospective purchaser of the Florissant Oaks property. The parties negotiated over the course of the next year. Finally, on June 13, 1989, Hardee's entered into a contract with MRO to purchase the property for $530,000. The Hardee's–MRO contract included several conditions precedent. Among these was the following:

> 2. *Conditions Precedent.* This Agreement is expressly conditioned upon the timely satisfaction of the following conditions precedent: ...

g. Buyer shall have sixty (60) days from the date of final execution hereof within which to obtain senior management approval of this acquisition of the Premises. Buyer agrees to notify Seller within three (3) business days following senior management's decision. Failure of Buyer to notify Seller within sixty-five (65) days following the date of final execution hereof of the obtaining or failure of senior management approval shall be deemed to be a failure of approval and this Agreement shall be declared null and void, ... and neither party shall have any further claim against the other.

In December 1989, the contract was amended and the time for satisfying the contingency for Hardee's senior corporate approval was extended until January 31, 1990. The amendment provided for automatic termination of the agreement on February 1, 1990 absent notice of satisfaction of the contingency. Hardee's senior management never approved the purchase. The contract to purchase the property was never consummated. Marriott refused to pay Dark any commission for procuring Hardee's as a potential buyer.

In April 1990, Hardee's purchased all of the stock of MRO from Marriott. The trial court made a specific finding that this was a "separate transaction and was unrelated to the purchase of the Florissant Oaks property." The court further found Dark had not only procured Hardee's as a prospective purchaser of the property, but he also assisted in the negotiations between Hardee's and MRO. The trial court concluded that a broker earns his commission when he procures a ready, willing, and able buyer with an enforceable contract. In the absence of an express condition that the broker's commission will be paid only upon the payment by the purchaser of the contract price, the commission is earned even though the sale is not closed. Accordingly, the trial court held Dark had earned his commission when the contract was signed on June 13, 1989, and awarded him $31,800, six percent of the contract price. MRO and Marriott appeal. We reverse.

Marriott and MRO maintain that the trial court erred by finding that Dark earned a commission under the terms of his listing contract once the Hardee's–MRO contract was executed. Marriott and MRO argue that Dark was not entitled to a commission until the buyer he procured entered a binding and enforceable contract. Because of the unmet conditions precedent, the Hardee's–MRO contract was never binding and enforceable.

■ On review of a court tried case, we will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ In general, a broker earns his commission from the seller when he produces a buyer ready, willing and able to buy on terms specified by the seller, whether or not the sale is completed. *Meridian Interests v. J.A. Peterson Enterprises, Inc.*, 693 S.W.2d 179, 182 (Mo.App.1985). Of course, the parties may vary the seller's duty to pay the broker's commission by express agreement within their listing contract. *Meridian* at 182.

In response to Marriott and MRO's argument, Dark claims that the listing contract did not alter the general duty of a seller to pay the broker's commission. Dark maintains that nothing within his contract with Marriott made his commission contingent on the sale being completed. At trial Dark argued that the provision which stated his commission was payable at closing only established the time of payment. It did not make his commission contingent on a closing. Dark also claims that the term "sale" includes a contract to transfer property rights, not just the actual transfer of property rights. In support of this argument, Dark cites this language from *Schulte v. Crites*, 300 S.W.2d 819 (Mo.App.1957):

The term "sale" has no fixed or invariable meaning but is to be interpreted in accordance with the manifest intention of the parties. A sale ordinarily is defined *as a contract* to transfer property rights for money paid or promised to be paid, but the term is broad enough to include the trans-

fer of property for any sort of valuable consideration.

*Schulte* at 822 (emphasis added) (citations omitted). Dark concludes that he earned his commission when Hardee's and MRO entered into the contract to transfer the property rights in the Florissant Oaks premises.

■ We agree with Dark that his contract with Marriott did not alter the usual agreement to pay a commission to a broker who procures a ready, willing and able buyer, whether or not the sale is consummated. Nothing within the listing contract manifested any intention to the contrary. Nor do we believe that Dark's commission was contingent on a closing. We also agree that the term "sale" in the listing contract includes, not only the actual transfer of property rights, but also a contract to transfer property rights. However, none of these conclusions are decisive of the dispositive issue in this case.

In *Suburban Realty Co. v. Sturgeon*, 443 S.W.2d 7 (Mo.App.1969), part of the court's decision dealt with a real estate broker's right to a commission for procuring a buyer who had entered into a conditional contract with the seller. The court stated:

> We therefore conclude that the contract of sale was a conditional contract and unless and until such condition was complied with and the contract became a binding obligation upon both parties, the plaintiff had not earned its real estate commission; this because it had not, in fact, secured a buyer who was ready, willing and able to buy the property.

*Id.* at 12.

In the present instance, Hardee's was not a ready, willing and able buyer. The contract between Hardee's and MRO included several conditions precedent. Hardee's conditioned its obligation under the sales contract upon the approval of senior management. Senior management never gave its approval, and the contract never became an enforceable obligation for either Hardee's or MRO. Therefore, Dark did not secure a ready, willing and able buyer. As such, he was not entitled to a commission. Additionally, Dark never procured a "sale" under the terms of his listing contract with Marriott.

Although we agree with Dark that "sale" includes a contract to transfer property rights, the Hardee's–MRO contract was never an enforceable contract and, therefore, did not constitute a sale for purposes of Dark's commission.

Dark cites several cases which support the principle that a broker who procures a ready, willing and able buyer is entitled to a commission regardless of whether the property sales contract is consummated. *See, for example, Isaac T. Cook Co. v. Craddock–Terry Co.*, 109 S.W.2d 731 (Mo.App.1937). However, Dark confuses the difference between a contract which is not performed and a contract which never becomes an enforceable obligation. In many instances, the seller and buyer may enter a binding agreement to transfer the property but never perform their respective promises. In such a case, the broker would be entitled to his commission absent any contractual agreement to the contrary. But here, where the buyer makes his commitment to buy contingent on several conditions which are never satisfied, the broker is not entitled to a commission.

■ A second issue raised by appellants requires mention only because it relates to the court's jurisdiction. The record shows that Dark had agreed to split his commission with another broker who in turn agreed to split his share with a third broker. Appellants argue that these two are indispensable parties and should have been joined. Presence of an indispensable party is a jurisdictional requirement. *Yellow Freight System v. Mayor's Commission*, 737 S.W.2d 250, 251 (Mo.App.1987).

The two brokers were not indispensable parties. They had an agreement with Dark, not with appellants. They have no claim or cause of action against appellants. *See State ex rel. Knight Oil Company v. Vardeman*, 409 S.W.2d 672 (Mo. banc 1966).

The judgment of the trial court is reversed.

GRIMM, P.J., and AHRENS, J., concur.